IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MARC S. SNODDY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-21-2528 |
| PRINCE GEORGE'S COUNTY GOVERNMENT, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff Marc S. Snoddy ("Plaintiff") has filed an Amended Complaint ("AC") against his former employer, the Prince George's County Government ("the County"), alleging retaliation and discrimination in violation of the Americans with Disabilities Act ("ADA") along with constructive discharge. ECF 18. The County has moved to dismiss the AC or, in the alternative, seeks judgment on the pleadings. ECF 19. This Court has reviewed the motion, along with the opposition and reply. ECF 21, 34. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons that follow, the County's motion, treated as a motion to dismiss, will be granted in part and denied in part.

I.  **FACTUAL BACKGROUND**

The facts contained herein are derived from the AC and are deemed to be true for the purposes of this motion. Plaintiff, who is "an African American citizen of the United States," began working as a police officer in the Prince George's County Police Department ("PGCPD") in 2010. ECF 18 ¶¶ 3, 9. Until his October 2018 performance appraisal, all of his performance appraisals were positive. *Id.* ¶ 9. Plaintiff received a PTSD diagnosis in early 2018. *Id.* ¶ 10. He also suffers from ADHD and hypertension. *Id.* ¶¶ 10, 11.

On January 5, 2018, during a meeting, Plaintiff's major accused Plaintiff of being a "thug," and his Lieutenant asked whether he had "problems working with white people." *Id.* ¶ 14. Plaintiff explained that he was "experiencing emotional challenges from professional, family and personal events that recently had occurred." *Id.* Plaintiff's captain ordered him to find a behavioral health specialist outside the Department. *Id.* ¶ 15. Plaintiff saw a therapist, who diagnosed him with PTSD, anxiety, depression, and hyperventilation. *Id.* ¶ 17. The therapist asked to speak to Plaintiff's Sergeant by phone, and Plaintiff agreed. *Id.* Shortly thereafter, Sergeant Jacob phoned Plaintiff and asked in an angry tone, "Is this the way you want to handle this? You can't handle being the police anymore? Because I can start the paperwork now." *Id.* ¶ 18. Plaintiff responded that he can do his job and just needed time to work through his mental health trauma. *Id.* ¶ 19.

Later that month, Sergeant Jacob called Plaintiff and threatened to place him on absence without leave ("AWOL") status if he failed to immediately return to duty. *Id.* ¶ 20. Plaintiff requested to use sick leave, but Sergeant Jacob refused. *Id.* He ordered Plaintiff to report to work on January 26, 2018. *Id.* Plaintiff said that he would but told Sergeant Jacob that as a result of a preexisting appointment with an attorney for his son, he might be late. *Id.*

During the meeting with the attorney, Plaintiff received several calls and text messages from Sergeant Jacob, demanding that he report to work. *Id.* ¶ 21. While Plaintiff returned home from the meeting, he received a call from Major Maldoon informing him that he was being suspended and directing him to come turn in his equipment. *Id.* ¶ 23. Major Maldoon told Plaintiff that "the suspension was for medical reasons and was not disciplinary." *Id.*

Plaintiff surrendered his equipment and learned that his police powers were suspended. *Id.* ¶ 24. Lieutenant Loveday ordered Plaintiff to make an appointment within twenty-four hours for psychological and physiological evaluation. *Id.* ¶ 25. She designated him temporarily to an

administrative position. *Id.* Plaintiff made the appointment with the mental health treatment provider. *Id.* ¶ 26. On January 30, 2018, Plaintiff's primary care physician put him in a "no duty" status. *Id.* ¶ 27. The mental health treatment provider, LaJoy Preston, conducted a psychological evaluation during the first week of February, 2018. *Id.* ¶ 28. Ms. Preston "told Plaintiff that she knew he had PTSD, but that she could not diagnose Plaintiff or refer him to a psychiatrist." *Id.*

On February 15, 2018, Plaintiff saw Dr. Williams, who recommended that, as a result of PTSD, Plaintiff continue treating with him and remain in "no duty" status for at least one year. *Id.* ¶ 29. Plaintiff submitted Dr. Williams's paperwork to the PGCPD's risk management office. *Id.* ¶ 30.

Several months later, in late June, 2018, the risk management office informed Plaintiff that the Chief had ordered his return to work on light-duty status. *Id.* ¶ 31. Plaintiff met with Lieutenant Stalling in the risk management office and asked to be assigned to a division where he would not have to talk to the public, as a result of his medical conditions and medication side effects. *Id.* ¶ 32. Plaintiff was assigned to the Homicide Cold Case Unit ("HCCU") in Landover, Maryland. *Id.* ¶ 33.

Upon reporting to the HCCU, Plaintiff had to check in with front desk officers since he had surrendered his credentials and access cards upon his suspension. *Id.* ¶ 34. One officer asked him whether he was a sex offender, but he responded that he was a Department Corporal. *Id.* His credentials were returned to him within a few hours. *Id.* ¶ 35. He received no complaints or negative feedback during his tenure in the HCCU. *Id.* ¶ 39.

In September, 2018, Plaintiff was sent back to the Narcotics Enforcement Division ("NED") and was assigned to Sergeant Marza's squad. *Id.* ¶ 41. Sergeant Marza told Plaintiff to

"watch his back" because some in the NED were unhappy about his return. *Id.* Other officers echoed the warning. *Id.*

At one point, Sergeant Marza asked Plaintiff what medication he had been taking and Plaintiff said, "the doctors keep me 'high' on Satara [Strattera]." *Id.* ¶ 43 (alteration in original). Strattera is an FDA-approved non-stimulant for ADHD. *Id.* Shortly thereafter, Plaintiff's new captain called him in and inquired about his medication. *Id.* ¶ 44. Plaintiff again said that his doctors had him "high" on Strattera, and the captain said that his daughter also takes Strattera. *Id.*

In late October 2018, Sergeant Marza issued Plaintiff's annual performance appraisal, which was low. *Id.* ¶ 45. Sergeant Marza told him that the scores were low because he had been on low- or no-duty status for most of the cycle. *Id.* The low score prevented Plaintiff from taking a promotional examination in Spring 2019. *Id.* ¶ 46.

On May 30, 2019, Sergeant Moody telephoned Plaintiff and told him that he was "being placed on sick leave because of his statements about being on Xanax and Adderall." *Id.* ¶ 50. Plaintiff tried to authorize the release of his medical treatment history, but Sergeant Moody refused to approve the HIPPA medical release form. *Id.* ¶ 51. Plaintiff has never taken Xanax. *Id.* ¶ 52.

On June 5, 2019, Plaintiff reported for duty to assist with an operation supervised by Sergeant Moody. *Id.* ¶ 53. Sergeant Moody assigned Plaintiff to drive the "jump van," which he had done only once before. *Id.* Plaintiff had not been trained on "jump van" procedures and protocols. *Id.* ¶ 54. While driving the jump van back to the office as directed, another vehicle drove recklessly at a high speed, and Plaintiff conducted an evasive maneuver to protect the safety of the jump van. *Id.* ¶ 55. No crash ensued, and Plaintiff returned safely to the office. *Id.*

Sergeant Moody collected statements from the officers about the incident. *Id.* ¶ 56. He began questioning Plaintiff and accusing him of unsatisfactory performance. *Id.* Plaintiff concluded the meeting, telling Moody, "you'll have my resignation in the morning." *Id.*

On June 6, 2019, Plaintiff called his primary care physician to report the incident and to report elevated blood pressure readings. *Id.* ¶ 58. His physician, Dr. Sood, again placed Plaintiff on "no duty" status due to his hypertension. *Id.* Later that evening, Sergeant Moody telephoned Plaintiff to impose a suspension and to ask him to turn in his equipment. *Id.* ¶ 59. Sergeant Moody also noted that he was on "no duty" status. *Id.*

In July, 2019, Chief Stawinsky ordered Plaintiff to return to full duty after the Medical Advisory Board ("MAB") reviewed Dr. Sood's medical records. *Id.* ¶ 61. Plaintiff reported to risk management to sign an acknowledgement for the return-to-work order. *Id.* ¶ 62. Plaintiff asked where he should report, and he was given only a tentative response. *Id.* Plaintiff said he would await further instructions. *Id.* Nearly two months later, no instructions came. *Id.* ¶ 63. Instead, on September 4, 2019, Plaintiff submitted a resignation letter, effective September 18, 2019. *Id.*

The next day, on September 5, 2019, the MAB advised Plaintiff that there was not enough information to overturn the return-to-work order. *Id.* ¶ 64. Plaintiff, however, had been awaiting direction as to where to return to work. *Id.* Following that meeting, Plaintiff telephoned Sergeant Moody on September 7, 2019, to advise that he wanted to rescind his resignation letter and return to work. *Id.* ¶ 66. He submitted a letter rescinding his resignation letter on September 9, 2019 and signed it on September 11, 2019. *Id.* ¶ 67. Regardless, on September 12, 2019, Chief Stawinsky "accepted" the resignation letter Plaintiff had attempted to rescind. *Id.* ¶ 68.

On September 13, 2019, Sergeant Moody met with Plaintiff to restore his police powers and arrange for him to retrieve his duty weapon. *Id.* ¶ 69. He returned him to full-duty status as of

September 16, 2019. *Id.* Plaintiff worked on full-duty status from September 16, 2019, to September 27, 2019, and the department paid him in full. *Id.* ¶ 70.

On September 26, 2019, Plaintiff's risk management point of contact texted him to ask when he had been diagnosed with PTSD. *Id.* ¶ 71. She followed up with a phone call. *Id.* The next day, September 27, 2019, Lieutenant Logan ordered Plaintiff to report to headquarters. *Id.* ¶ 72. At the meeting, Assistant Chief Jacqueline Raftery handed Plaintiff a letter dated September 27, 2019, accepting his resignation and placing him on paid administrative leave through October 11, 2019. *Id.* The letter moved the effective date of Plaintiff's resignation to October 11, 2019. *Id.*

As a result of the actions described above, Plaintiff alleges that he suffered economic damages including lost wages and benefits, loss of status and prestige, emotional distress, and medical expenses. *Id.* ¶ 81. This lawsuit ensued.

## II.   LEGAL STANDARD

The County has filed a motion to dismiss the AC on several grounds.[1] Initially, this Court notes that the County's alternative motion for judgment on the pleadings is premature because the pleadings have not yet closed. *See* Fed. R. Civ. P. 12(c) (allowing such a motion "[a]fter the pleadings are closed—but early enough not to delay trial"). And both parties attached exhibits to their filings, but consideration of most exhibits is inappropriate at the motion to dismiss stage, which is governed by the four corners of the complaint. Given that no discovery has occurred, this Court will treat the pending motion only as a motion to dismiss and will disregard the parties' exhibits unless specifically addressed below.

---

[1] Defendant's first argument is that Plaintiff names "Prince George's County Government" as a defendant instead of "Prince George's County, Maryland." ECF 19-1 at 6–8. Plaintiff will be afforded an opportunity to amend his complaint to fix the nomenclature.

A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g., In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).

### III. ANALYSIS

Plaintiff's AC contains three Counts: (1) unlawful discrimination in violation of the ADA; (2) unlawful retaliation in violation of the ADA; and (3) constructive discharge in violation of the ADA. Initially, this Court is unaware of any separate ADA claim for constructive discharge. While it is possible for conduct violative of the ADA to amount to constructive discharge, the ADA claim would still have to be premised on discrimination, failure to accommodate, or retaliation. And Plaintiff disavows any intent to bring a state law constructive discharge claim. ECF 21 at 17. Accordingly, this Court will dismiss Count Three, although Plaintiff will be free to contend that the alleged discrimination he suffered amounted to constructive discharge for the purpose of calculating his damages, if any.

### A.  Failure to Exhaust Administrative Remedies

After his employment ended, Plaintiff filed a charge with Prince George's County's Human Resources Commission ("HRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination. ECF 21-9. After its investigation, the HRC issued an order on January 25, 2021, finding that Plaintiff's allegations were not substantiated and advising Plaintiff of his right to file an appeal to the Circuit Court for Prince George's County. ECF 19-5. The EEOC subsequently issued a Notice of Right to Sue on July 7, 2021. ECF 21-10. Plaintiff then filed this lawsuit. Defendant argues that Plaintiff failed to exhaust his administrative remedies when he failed to appeal the HRC's decision to the Circuit Court for Prince George's County.

The ADA does not require a plaintiff to exhaust his claims fully through state appellate processes before filing a claim in federal court. Instead, the only requirement is that the plaintiff file a charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1). Plaintiff fulfilled that requirement here. The various cases Defendant cites are inapposite because they are not ADA cases.  *See* ECF 19-1 at 10–11 (citing cases in the pension, zoning, and other administrative contexts). Plaintiff's failure to appeal the HRC decision in state court, then, does not bar his ADA claim.

### B.     Discrimination Claim

Defendant suggests that Plaintiff has failed to plead a prima facie case of discrimination. However, a plaintiff is not required to plead a prima facie case of discrimination to overcome a motion to dismiss. *See Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002) (explaining that the prima facie case required by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) "is an evidentiary standard, not a pleading requirement"); *see also McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584–85 (4th Cir. 2015). Whether Plaintiff will eventually be able to

establish, for example, that other similarly situated employees were treated differently is not the standard at the motion to dismiss phase. The correct standard is whether a plaintiff has plausibly alleged discriminatory conduct under the notice pleading standard of Fed. R. Civ. P. 8(a). *See Swierkeiwicz,* 534 U.S. at 510–11.

Here, Plaintiff sufficiently alleges that Defendant discriminated against him on the basis of disability. To state a claim for disability discrimination under the ADA, the plaintiff must allege facts to show that "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Rhoads v. FDIC,* 257 F.3d 373, 387 n.11 (4th Cir. 2001) (quoting *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001)).

Defendant suggests that Plaintiff's complaint failed to plead facts indicating that he was substantially limited in his major life activities such that he enjoyed ADA protection. Given that the "substantially limits" standard is "not meant to be a demanding standard," 29 C.F.R. § 1630.2(j)(1) (2022), at this early stage of the litigation, Plaintiff's assertions suffice. He has alleged several medical conditions that cause substantial limitations, and he outlined different medical restrictions that were placed on his ability to work during the relevant time frame. *See, e.g.,* ECF 18 ¶¶ 10–12, 27, 29.

Next, Defendant argues that Plaintiff has not sufficiently alleged any adverse employment action. An adverse action must impact the "terms, conditions, or benefits" of employment. *James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 375 (4th Cir. 2004) (citations omitted). While Plaintiff's AC includes a grossly overinclusive list of twelve alleged "materially adverse actions," many of which (like "threatening" or "manifesting animosity") fall well short of that standard,

there are a few adverse actions included within that list: Plaintiff's suspension in January 2018 and administrative leave in June 2019, his poor performance appraisal in 2018, the failure to reinstate him to work in 2019, and the failure to consider his recission of his resignation/claim for constructive discharge. ECF 18 ¶ 80. Taking all of the alleged facts in the light most favorable to Plaintiff, he has adequately alleged an ADA discrimination claim as to that subset of adverse actions, and Defendant's motion to dismiss will be denied as to those claims, though it will be granted as to the rest.

### C. Retaliation Claim

Count Two alleges retaliation, which requires Plaintiff to show "(i) that [he] engaged in protected activity and, (ii) because of this, (iii) [his] employer took an adverse employment action against [him]." *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 577 (4th Cir. 2015) (citing *Rhoads*, 257 F.3d at 392); *see also Thompson v. City of Charlotte*, 827 F. App'x 277, 279 (4th Cir. 2020). While a plaintiff need not allege a prima facie case of retaliation, the standards can be useful in assessing whether the plaintiff has alleged a viable claim.

Plaintiff's claim is deficient because he has not alleged any specific facts suggesting that he took actions protected by the ADA. In conclusory fashion at ¶ 79 of the AC, Plaintiff states:

> Between January 2018 and October 11, 2019, Plaintiff engaged in activities protected under the ADA through communications with Defendant's managers, supervisors and agents regarding (1) leave for his disabilities consistent with Defendant's policies; (2) full employment opportunities rather than limited duty; (3) a return to full-duty in July 2019; and (4) Plaintiff's expressed opposition to Defendant's managers', supervisors' and agent's hostility to his disabilities and his use of psychotropic medications.

The difficulty is that the AC contains no facts setting forth any such communications and does not describe the contents of or the participants in any such conversations. Plaintiff details no instances where he "expressed opposition" to anything or made any reference to the ADA or disability in

his communications with his supervisors, instead simply cataloguing what people said or did to him without describing anything he said or did in response. Without such allegations, he at present has not alleged any protected actions that could form the basis for his retaliation claim. The precise nature of communications determines whether they constitute protected activity or not. *See, e.g., Lashley v. Spartanburg Methodist College,* 66 F.4th 168, 180 n.2 (4th Cir. 2023) (noting that "generalized health complaints, as opposed to a more formal request for an ADA accommodation, do not rise to the level of ADA-protected activity"). And a decisionmaker's awareness of protected activity is necessary to advance a plausible claim that the decisionmaker took retaliatory action. Of course, Plaintiff's eventual filing of his HRC/EEOC charge would constitute protected activity. But because that charge followed his termination, it could not have been the reason motivating any pre-termination actions by the County.[2]

In sum, Plaintiff has failed to allege facts to plausibly suggest that the County took any action in response to ADA-protected activity. Count Two will therefore be dismissed.

**CONCLUSION**

For the reasons set forth above, the County's Motion to Dismiss, ECF 19, will be GRANTED except that it is DENIED as to Plaintiff's disability discrimination claims pertaining to his suspensions in January, 2018 and administrative leave in June, 2019, his poor performance appraisal in 2018, the failure to reinstate him to work in 2019, and the failure to consider his

---

[2] Plaintiff also failed to exhaust his retaliation claim in his charge before the EEOC, which may render it independently subject to dismissal even if he had alleged protected activity. *See Tillberry v. Kent Island Yacht Club, Inc.,* Civ. No. CCB-09-02956, 2010 WL 2292499, at *6 (D. Md. June 4, 2010) ("A retaliation claim may be raised for the first time in federal court by relating back to a previous EEOC charge . . . so long as the retaliatory conduct complained of occurred *after* the EEOC charge was filed.") (emphasis in original). This Court need not reach this issue because no viable retaliation claim has been asserted.

recission of his resignation/claim for constructive discharge. The case will proceed to discovery as to those claims, and Plaintiff is granted limited leave to file a Second Amended Complaint within ten days of the date of this opinion, only to remove the dismissed claims and to remedy the name of the Defendant.[3] A separate Order follows.

Dated: August 24, 2023
                                                 /s/
Stephanie A. Gallagher
United States District Judge

---

[3] To the extent Plaintiff wishes to amend his complaint again in any other respect, he must seek leave of court.